**Octavius ANDERSON, et al, Plaintiffs,**

v.

**PILGRIM'S PRIDE CORP. Defendant,**

**No. 9:98–CV–7.**

United States District Court,
E.D. Texas,
Lufkin Division.

April 9, 2001.

Philip R. Russ, George E. Chandler, Chandler Law Officer, Amarillo, TX, Lufkin, for plaintiff.

Edward L. Kemble, Estil A. Vance, Kevin C. Norton, Cantey & Hanger, Fort Worth, Curtis William Fenley, III, Fenley & Bate, Lufkin, TX, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HANNAH, District Judge.

Came on this day consideration of the bench trial conducted before this Court during the first full week of March, 2001. Having considered the evidence submitted, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. Any finding of fact more properly characterized as a conclusion of law should be construed as such. Any conclusion of law more properly characterized as a finding of fact should be construed as such.

## I. BACKGROUND

Pilgrim's Pride engages in the slaughter of chickens and the processing and distribution of chicken products throughout the United States. Plaintiffs are current or former production employees paid on an hourly basis who work or have worked at Pilgrim's Pride plants in Lufkin, Texas, Nacogdoches, Texas, or Mt. Pleasant, Texas. Octavius Anderson, the lead Plaintiff, has brought this action on behalf of himself and other similarly situated employees of Pilgrim's Pride Corporation to recover unpaid wages, overtime compensation, liquidated damages, attorneys' fees, and costs under the provisions of the Fair Labor Standards Act of 1938, as amended 29 U.S.C. §§ 201, et seq. Plaintiffs have also asserted claims for breach of contract.

## II. FINDINGS OF FACT

1. Each of the three Pilgrim's Pride plants involved in this lawsuit are divided into several different departments, or lines: Back Dock, Evisceration, Cutup, Whole Bird, Prepared Foods, Fillet, Weldatron, etc. The production employees in each of the various departments are paid on "line time." "Line time" begins at a predetermined time for each department. In essence, "line time" commences when the first chicken arrives at the first employee's individual work station on a particular line. For example, "line time" begins at the Evisceration department in the Lufkin plant at 5:27 a.m., the time when the "Hangers" in Evisceration begin hanging the chickens. "Line time" ends when

the last chicken passes that same first employee's individual work station on a particular line. For example, "line time" ends in Evisceration at the Lufkin plant when the "Hangers" hang the last chicken at the end of the shift. The ending time is captured when a supervisor or line worker manually inserts a punch card into a time clock located near the production line.

2. The production employees in the various departments are required by Pilgrim's Pride to don certain safety and sanitary equipment before taking their place on the production line in order to comply with United States Department of Agriculture safety and sanitary regulations. In addition, some employees wear other clothing items for their convenience, and to aid in their job performance. The clothing and equipment varies according to particular positions and job assignments. However, multiple combinations of clothing are worn from the following list of items: apron, smock, cotton gloves, rubber gloves, mesh glove, kevlar glove, rubber boots, cooler boots, hairnet, hearing protection (ear plugs), plastic sleeves. Some production employees in the Back dock department also wear ace bandages, paper towel wrap, dust mask, and safety goggles.

3. Production employees are responsible for making sure that their clothing is properly sanitized prior to arriving at their individual work station. Accordingly, production employees spend a short amount of time prior to their work day, during breaks, and after their work day sanitizing their equipment. The sanitization process usually involves dipping their gloves in a sanitary solution, spraying off their apron, and spraying off their rubber boots. In most cases, the various production employees complete this process in a matter of seconds, not minutes.

4. Production employees don and doff their sanitary and safety equipment several times during the course of the day depending on the number of breaks taken. In most cases, employees put on and remove ear plugs, smock, apron, and gloves (rubber and cotton). Some employees leave their hairnets on during the breaks. The amount of time spent donning and doffing the various pieces of clothing varies according to department, individual dexterity, and individual preference.

5. At various points during the day, the employees will don and doff sanitary equipment at a casual pace. In those instances, the employees may spend over one minute with this process. However, many employees accomplish this process in a matter of seconds if they so choose. In fact, it is not uncommon to find employees putting on their apron, gloves, hairnet, and hearing protection as they walk to their individual work station.

6. A very small number of production employees utilize knives and scissors in their work. These employees usually wear a mesh or kevlar glove on the hand opposite their cutting hand. Approximately 30 people per shift wear a kevlar glove in the Lufkin plant. The employees who use knives, scissors, and a kevlar glove do not clean these items outside of "line time."

7. The hourly paid production employees have individual time cards that they swipe into an electronic time clock each day they arrive for work. This time, referred to as KRONOS time, does not affect the amount of money paid to each of the employees because the employees are paid according to "line time." However, if employees arrive late to their respective work stations, the KRONOS system automatically deducts time from the employees' individual time records.

8. Employees often arrive at the plant and swipe their KRONOS card fifteen minutes or more prior to the beginning of

line time. For the next several minutes, these employees may talk with fellow employees in the cafeteria, drink coffee, or even play dominoes. Some employees utilize this time to put on work clothing and equipment. Later, the employees' supervisors will arrive in the breakroom and inform them that the line is about to commence. At that point, many employees will begin walking to their respective work stations.

9. Despite the fact that employees often show up several minutes prior to the beginning of line time, an employee is on time for work if he is present at his individual work station when the first piece of chicken arrives at his station. For example, "line time" begins on the Lufkin Evisceration line/morning shift at 5:27 a.m. At that time, "Hangers" begin to hang the chickens and paid work time for each of the employees in Evisceration commences. However, "Openers," "Liver Pullers," "PAC Pullers," and "Mirror Trimmers" are not required to be at work at 5:27 because the chicken product has not yet arrived at their individual work station. Indeed, the chicken product does not arrive at the Mirror Trimmer's work station until 5:35. Accordingly, the Mirror Trimmer does not have to be at his individual work station until 5:35 a.m., and Pilgrim's Pride is prohibited from disciplining the Mirror Trimmer for tardiness if he is present at his work station at that time.

10. Plaintiffs failed to produce evidence demonstrating that Pilgrim's Pride deducts paid work time from employees who are present at their work station when the first piece of chicken product arrives at their specific location. Although the Plaintiffs introduced evidence that employees are told during orientation training that they should arrive for work at least 15 minutes prior to their shift, the employees understand that they are not required to be at their individual work station until the first piece of chicken product arrives at their station. Prior to that time, the employees are free to organize their life in any manner they wish. The Defendant only requires that the employees are: 1) present at their particular work station when the first piece of product appears with 2) the required sanitized clothing on their person.

## III. CONCLUSIONS OF LAW

Plaintiffs brought this action for backpay pursuant to 29 U.S.C. § 216(b) of the Fair Labor Standards Act. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Pilgrim's Pride is an employer within the meaning of the FLSA. Its business activities constitute an enterprise engaged in commerce or in the production of goods for commerce as defined in 29 U.S.C. § 203(s)(1). Plaintiffs are similarly situated, and the class of Plaintiffs is properly before the Court.

This case presents two general issues to the Court. First, does the manner in which Pilgrim's Pride utilizes "line time" to measure hours worked comply with the record keeping provisions of the FLSA. Second, does the donning, doffing, and cleaning of the various items of clothing worn by the line employees prior to the shift, during breaks, and after the shift require compensation under the FLSA?

### A. Line Time

The generally prevailing practice in the poultry processing industry is to pay production employees according to "line time." Neither the Fair Labor Standards Act nor any regulations interpreting the same provide any legal basis for the contention that Pilgrim's Pride is in violation of the FLSA for capturing hours worked through the use of "line time." Accordingly, the Court finds that Defendant's method of utilizing

"line time" to capture hours worked along with its accompanying documentation system complies with the record-keeping provisions of the FLSA as a matter of law.

## B. Donning, Doffing, and Cleaning of Sanitary and Safety Equipment

### 1. Work

■ The FLSA requires that an employer pays its employees for time spent engaged in work. Work is "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." *See Reich v. IBP, Inc.*, 38 F.3d 1123, 1125–26 (10th Cir.1994) (quoting *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598, 64 S.Ct. 698, 88 L.Ed. 949 (1944)).

■ In the instant case, the majority of "line employees" wear a hairnet, ear plugs, rubber boots, and gloves (cotton, rubber, or both). In addition, many employees wear an apron and a smock.[1] During the course of the trial, the Court viewed a videotape of line employees donning and doffing this type of equipment. The videotape indicated that many employees take less than a minute to put on this equipment. In addition, the videotape showed several employees putting on certain items of clothing (e.g., hairnet, ear protection, gloves, smock, apron, etc.) while walking to their individual work station. Furthermore, other evidence adduced at trial indicated that the rubber boots are, in most cases, put on by the line employees prior to arriving at the plant. Due to the fact that the donning and doffing of these items takes seconds to accomplish and requires

very little concentration, the Court finds that the donning and doffing of these items does not involve "physical or mental exertion", and, therefore, does not qualify as work within the meaning of the FLSA.

A small number of line employees wear other clothing items. The items include a kevlar or mesh glove, plastic sleeves, dust masks, and safety glasses. In addition, some Back Dock employees wear paper wraps or ace bandages to protect their arms from the live chickens. With respect to the plastic sleeves, safety glasses, and mesh glove, the Court also finds that the donning and doffing of these items does not involve physical or mental exertion. With respect to the various items worn by line employees on Back dock, the Court finds that the dust masks and paper wraps worn by these employees are not required by the employer and are used primarily for the benefit of the employee. The donning and doffing of these items is also not work, and thus not compensable under the FLSA.

Plaintiffs contend that *Reich v. Monfort, Inc.*, 1995 WL 817796 (D.Colo.1995), upheld at 144 F.3d 1329 (10th Cir.1998), should persuade the Court to find that the disputed activities are compensable. However, *Monfort* addressed a comparable, but distinguishable fact pattern. In *Monfort*, employees at a meat packing plant in Greeley, Colorado were paid on "line time", and were not compensated for either the time spent donning and doffing safety and sanitary clothing and equipment, or the time spent cleaning that equipment (including cutting knives). During the course of litigation, the meat packing company admitted that the time spent donning sanitary and protective gear

---

1. Pilgrim's Pride requires all employees who handle chicken product to have a clean outergarment on over the employee's street clothes, but not does not require that employees wear both a smock and apron. Thus, some employees choose to wear an apron and not a smock. Conversely, some employees choose to wear a smock but not an apron.

was compensable work .[2] After trial, Chief Judge Matsch determined that the activities constituted ten minutes per day, and held that this amount of time was not de minimis as a matter of law.[3] The Tenth Circuit, although noting that this was a close case, upheld the district court's conclusion that the work was not de minimis as a matter of law.[4]

. At first glance, *Monfort* supports Plaintiffs' arguments in this lawsuit. However, *Monfort* is distinguishable from the case at bar for several reasons. First, and foremost, the clothing items worn by the meat packing employees are heavier, and more cumbersome than the clothing items worn by the poultry workers in this case. Both meat packing workers and poultry workers wear earplugs, hairnets, cotton frocks, rubber aprons, rubber gloves, and cotton gloves. However, meat packaging employees wear scabbards, arm guards, arm mesh, mesh apron, back mesh, a "wizard glove", and gaiters. None of the poultry workers at Pilgrim's Pride wear these additional items. Second, in contrast with the meat packing employees, the relatively small number of Defendant's poultry line employees who use knives do not clean their knives before their shift begins, after their shift begins, or during breaks. Furthermore, the poultry employees do not walk to a knife room to pick up new knives outside of line time.

Because meat packing employees wear heavy protective gear that can become extremely soiled, it is easier to argue that these employees exert burdensome physical and mental energy when they put on, take off, and clean their equipment. Presumably, meat packing employees expend a significant amount of energy and concentration performing these activities. Accordingly, the meat packing company in *Monfort* did not dispute that those activities constitute "work".

Conversely, in the instant case, the items worn by the poultry workers are not cumbersome when compared to the additional armor-like gear that must be worn by their counterparts in the meat packing industry. As such, it takes much less time, energy, and concentration for the poultry workers to don, doff, and clean their sanitary clothing. Accordingly, *Monfort* is not persuasive authority, and the activities performed by the line employees in this case do not constitute compensable work.

## 2. Portal–to–Portal Act

In 1947, Congress enacted the Portal–to–Portal Act to clarify the duties of employers concerning compensating employees for incidental activities that constitute work but which occur before, after, or during the work shift. Under the Portal–to–Portal Act, employers are not required to compensate employees for activities which are preliminary or postliminary to the employee's principal work activities.[5] A key case interpreting which activities are preliminary or postliminary under the Portal–to–Portal Act is *Steiner v. Mitchell.*[6]

In *Steiner,* the Supreme Court held that "activities performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the FLSA if those activities are an integral and indis-

---

**2.** *Monfort,* 1995 WL 817796, at *2.

**3.** *Id.* at *3.

**4.** *Monfort,* 144 F.3d at 1334.

**5.** 29 U.S.C. § 251(a).

**6.** 350 U.S. 247, 76 S.Ct. 330, 100 L.Ed. 267 (1956).

pensable part of the principal activities for which covered workmen are employed and are not specifically excluded."[7] The *Steiner* Court also recognized the general rule that clothes changing and cleaning is not compensable.[8]

In *Steiner*, the Court found that the employees were entitled to compensation for changing clothes and showering due to the fact that employees worked in a battery factory and were exposed to toxic chemicals.[9] However, most federal courts have relegated the precedential value of the *Steiner* decision to its unique facts. *See Reich v. IBP*, 820 F.Supp. 1315, 1324 (D.Kan.1993) (recognizing that the *Steiner* holding is to be construed narrowly and noting that the decision in favor of compensability was based on the extreme dangers involved in working with toxic chemicals). In a similar fashion, this Court finds the clothes changing and cleaning involved in the instant case to be distinguishable from the clothes changing and showering involved in the *Steiner* decision.

Plaintiffs contend that the time spent changing and sanitizing clothing should be compensable because Pilgrim's Pride and the USDA requires them to wear and sanitize the clothing at issue. However, the argument that donning and doffing sanitary clothing is a compensable, principal activity merely because both the employer and the USDA require the sanitary clothing to be worn has been rejected by other courts.

In *McComb v. C.A. Swanson & Sons,* production employees in a poultry plant were legally required to wear aprons, frocks, and other outer clothing and to maintain the cleanliness of the garments.[10] However, despite the fact that the poultry company could not lawfully engage in its business without employee compliance with these clothing requirements, the *McComb* court determined that putting on this clothing was a preliminary activity, and thus not compensable.[11] *See also* Reich v. IBP, Inc., 38 F.3d 1123, 1125 (10th Cir.1994) (determining that the donning and doffing of sanitary outergarments worn by meat processing employees, although required, is not integral and indispensable to the employer, and is, therefore, a preliminary and postliminary activity within the meaning of the Portal Act).

In the instant case, the wearing of clean outergarments benefits the employees because it protects their street clothes from becoming soiled. To be certain, the wearing of these outergarments also benefits Pilgrim's Pride. However, in light of preexisting case law, the clothes changing activity required of the line employees in this case is not "integral and indispensable" to their principal jobs. Thus, the Court concludes that the donning and doffing of the sanitary and safety equipment qualifies as a preliminary and postliminary activity within the meaning of the Portal-to-Portal Act.[12]

### 3. De Minimis Doctrine

Pilgrim's Pride argues that the amount of time spent donning, doffing, and sanitizing the clothing and equipment is de

---

7. *Id.* at 256, 76 S.Ct. 330.

8. *Id.* at 249, 76 S.Ct. 330. The Portal Act specifically excludes clothes changing time from being a compensable activity. 29 U.S.C. § 254(a).

9. *Id.* at 250, 76 S.Ct. 330.

10. 77 F.Supp. 716, 720 (D.Neb.1948).

11. *Id.* at 735.

12. The Court also concludes that the "walk time" to an employee's work station is not compensable under the Portal–to–Portal Act.

minimis as a matter of law. Courts should weigh four factors to determine whether an activity is de minimis as a matter of law. The four factors include: (1) the amount of daily time spent on the additional work; (2) the administrative difficulty in recording the time; (3) the size of the aggregate claim; and (4) the regularity of the work. *See Lindow v. United States,* 738 F.2d 1057, 1062–63 (9th Cir.1984). *See* also 29 C.F.R. § 785.47 (de minimis rule should be applied "only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable working period of time he is regularly required to spend on duties assigned to him").

The Court has already determined that the activities at issue are not work and are preliminary and postliminary under the FLSA. Accordingly, an extensive analysis of the de minimis doctrine is unnecessary. However, assuming arguendo that the activities at issue in this case were compensable, the de minimis doctrine would still preclude the Plaintiffs from recovering their otherwise compensable time because of the small duration of time spent on the activities.

The Court has noted that most employees don and clean their sanitary clothing and personal equipment in approximately one minute. Moreover, employees spend even less time doffing their sanitary clothing. Assuming that some employees don and doff their clothing slowly, it is still evident that the slow dressers would not spend more than 1–2 minutes each time they don their equipment and would spend even less time each time they doffed their equipment. Accordingly, the amount of uncompensated time spent on these activities for slow dressers would still be less than 10 minutes per day.

The majority of courts have found daily periods of approximately 10 minutes de minimis as a matter of law. *See Lindow,* 738 F.2d at 1062. Therefore, the Court finds that the amount of time spent donning the various items, doffing the various items, and sanitizing the clothing is de minimis as a matter of law.

### 4. Custom or Practice

■ Section 203(*o*) of the FLSA also excludes the relevant activities from compensable time for employees in the Lufkin and Nacogdoches plants. Section 203(*o*) states that:

> In determining for the purposes of sections 206 and 207 of this title the hours for which an employee is employed, there shall be excluded any time spent in changing clothes or washing at the beginning or end of each workday which was excluded from measured working time during the week involved by the express terms of or by custom or practice under a bona fide collective-bargaining agreement applicable to the particular employee. 29 U.S.C. § 203(*o*).

The Lufkin and Nacogdoches plants are union facilities governed by collective bargaining agreements. Two separate collective bargaining agreements between Pilgrim's Pride and the United Food & Commercial Workers Union (the "UFCW") governed the Lufkin plant from 1996–2001. Similarly, two collective bargaining agreements governed the Nacogdoches facility from 1997–2001. None of these collective bargaining agreements provided that line employees would be compensated for changing and cleaning sanitary clothing. In fact, line employees were never compensated for changing and cleaning sanitary clothing during the aforementioned period of time.

■ The Court finds that there is both a custom and practice under the collective bargaining agreements of not compensating line employees for donning and doffing sanitary clothing and equipment. Pilgrim's Pride produced evidence at trial that, in 1993, the UFCW proposed compensating line employees for "wait time" and the time spent donning and doffing sanitary clothing and equipment. Pilgrim's Pride, however, rejected this proposal, and continued its policy of not compensating line employees for "wait time," or the time spent donning, doffing, and cleaning sanitary clothing and equipment.

■ The express provisions of subsequent collective bargaining agreements do not mention this issue. However, "[i]f the parties to a collective bargaining agreement negotiate over an issue and have an understanding that resolves it, then a 'practice' exists, even in the absence of express written terms." *Arcadi v. Nestle Food Corp.*, 38 F.3d 672, 675 (2nd Cir. 1994); *see also Hoover v. Wyandotte Chemicals Corp.*, 455 F.2d 387, 389 (5th Cir.1972) (holding that union abandonment of demand for 23–25 paid clothes-changing/showering minutes constituted union acquiescence to employer's long-standing 15 minute policy); *Saunders v. John Morrell & Co.*, No. C88–4143, 1991 WL 529542, at *4 (N.D.Iowa Dec.24, 1991) (failure to pay workers for clothes-changing time during previous five years demonstrated a custom or practice existed to exclude time); *Williams v. W.R. Grace & Co.*, 247 F.Supp. 433, 435 (E.D.Tenn.1965) ("custom and practice were followed exempting clothes-changing and washing time from wage-payment"); *Nardone v. General Motors*, 207 F.Supp. 336, 340 (D.N.J.1962) (policy of non-compensation for changing time existed because the collective bargaining negotiations encompassed the issue).

It is evident that Local 408 and Local 540 signed the collective bargaining agreements knowing that line employees would not be compensated for the activities at issue in this case. The UFCW's understanding that clothes-changing time and "wait time" were not compensable under the agreements constitutes a "practice" for purposes of Section 203(*o*). Pilgrim's Pride long-standing policy of non-compensation for these activities similarly constitutes a "custom" for purposes of Section 203(*o*).

## IV. CONCLUSION

For the aforementioned reasons, the Court finds that Defendant has not violated the FLSA. In addition, the Court concludes that Defendant did not breach any employment contracts it had with the non-union Mt. Pleasant plaintiffs. Any additional claims against the Defendant are also hereby DENIED. A final judgment stating that Plaintiffs shall take nothing in their claims against the Defendant shall be forthcoming.

It is so ORDERED.